Bohn, J.
The plaintiff, WRT Management Corporation (“WRT”), brought an action seeking a declaration that the defendant, Commonwealth of Massachusetts Division of Fisheries and Wildlife (“Division”), has no statutory authority pursuant to the Massachusetts Endangered Species Act (“MESA”) to require WRT to obtain a “conservation and management permit” in connection with its plans to develop a golf course in the town of Sturbridge, Massachusetts (“site”). Additionally, WRT seeks a declaration that the Division’s certification of sixteen vernal pools at the site, under its Natural Heritage and Endangered Species Program (“NHESP”), lacks statutory authority; injunctive relief restraining the Division from requiring a permit and from certifying the vernal pools; and rulings that the Division’s actions deprive WRT of its property without due process of law.
The matter is before the court on cross motions of the parties for summary judgment. For the reasons detailed below, plaintiffs motion for summary judgment will be DENIED, and defendant’s motion for summary judgment will be ALLOWED.
*610 Background
WRT Management Corporation has aspirations of developing the Country Club of Massachusetts, a golf course to be located in Sturbridge, Massachusetts. On October 6, 1998, however, the Commonwealth of Massachusetts Division of Fisheries and Wildlife informed WRT that Division personnel had observed a Marbled Salamander, a “threatened” species under regulations promulgated pursuant to the Endangered Species Act, at the site. Furthermore, In April 1999, Division personnel advised WRT that Four-toed Salamanders, designated as “species of special concern,” were observed on the site; and, on July 19, 1999, that fourteen vernal pools had been discovered and certified on the property.[1] The Division took the position that, for starters, the salamanders’ presence at the site required WRT to obtain a conservation and management permit to develop the property because the golf course design showed that it would impact on upland areas, a space 150 meters around the wetland habitats that support salamander life.
The management corporation hired its own expert who confirmed the Division’s observation of the four-toed salamanders, and WRT now acknowledges that its planned development would impact these upland • areas. Rather than applying for a conservation and management permit, however, WRT filed this action for declaratory and injunctive relief, challenging the authority of the Division to act as it has.
Discussion
The court will grant summary judgment where there are no genuine issues of material fact and where the record,. including the pleadings and affidavits, entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Corrections, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and showing that summary judgment entitles it to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party satisfies this burden by submitting affirmative evidence refuting an essential element of the opposing party’s case, or by showing that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). The court, for purposes of summary judgment, will review the facts and all reasonable inferences from those facts in the light most favorable to the non-moving party. Ford Motor Co., Inc. v. Barrett, 403 Mass. 240, 242 (1988).
I. The Issue of Standing
As an initial matter, the Division contends that WRT lacks standing to seek a declaratory judgment. It suggests that WRT can only bring these matters before the court for judicial review after all administrative remedies are exhausted.
WRT asserts that it has standing because it can “allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." Massachusetts Ass’n of Indep. Ins. Agents & Brokers v. Commissioner of Ins., 373 Mass. 290, 293 (1977).
While WRT’s assertion that its alleged injuries are within the statute’s “area of concern” are somewhat weak, the Court nevertheless concludes that WRT has standing to seek declaratory relief on the facts of this case.
A party may seek declaratory relief under G.L.c. 231 A, §1, if it can show that it has legal standing and that it is involved in an actual controversy. Massachusetts Ass’n of Indep. Ins. Agents & Brokers. Id. Determining whether a party has legal standing requires an assessment of several factors. Those factors include the Legislature’s intent in passing the statute, the statute’s administrative and remedial schemes, the consequences of recognizing standing and whether there is any binding legal precedent. Enos v. Secretary of Environmental Affairs, 432 Mass. 132, 135-36 (2000). A property owner engaged in the development of his or her property can demonstrate that an actual controversy exists and that he or she has legal standing when an administrative decision, which the owner maintains is invalid, affects the owner’s rights by causing delays or extra development expense. Villages Development Co. v. Secretary of the Executive Office of Environmental Affairs, 410 Mass. 100, 106 (1991). Since WRT contends the Division’s actions are beyond its statutory authority and would result in significant impairment of their property rights, either by preventing the intended development or by subjecting it to additional costs, it has stated a claim appropriate for declaratory relief and standing to assert that claim.
II. The Issue of the Salamanders
The parties disagree over the meaning and applicability of the term “take” as it is defined in the Endangered Species Act.
The statute defines the term “take” as follows:
[i]n reference to animals, to harass, harm, pursue, hunt, shoot, hound, kill, trap, capture, collect, process, disrupt the nesting, breeding, feeding or migratory activity or attempt to engage in any such activity ...
G.L.c. 131A, §1.
The Division contends that a golf course will disrupt the salamanders’ nesting, breeding, feeding or migratory activities and, therefore, WRT’s proposed development is within the statutory definition of a “taking.” For its part, WRT argues that it is not disrupting the salamanders’ protected activities, merely altering the habitat in which those activities take place. Therefore, according to WRT, the Division must regulate its development of a golf course, if at all, as a “significant habitat” in accordance with G.L.c. 131A, §4, and not *611 as a “taking" under G.L.c. 131A, §2. The distinction is important because designation as a significant habitat can only take place after the Division implements additional procedural protections not present here. Additionally, the regulation of significant habitats is allowed only when endangered or threatened species are present, not in cases in which a species of special concern, such as the Four-toed Salamander, are at issue.
A court must interpret a statute “according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished ..." Commonwealth v. Connor C., 432 Mass. 635, 640 (2000).
In performing this task, a court must strive to interpret the statute as a harmonious whole without superfluous or contradictoiy provisions. See First National Bank v. Bernier, 50 Mass.App.Ct. 756, 759 (2001). However, “(t]he interpretation of a statute by the agency charged with the primary responsibility for administering it is entitled to substantial deference.” Gateley’s Case, 415 Mass. 397, 399 (1993).
In applying these principles of statutory construction to the various provisions of MESA, the Court discerns a clear distinction between the disruption of species’ activities that trigger a “take” as defined in §1, and the alteration of species habitat addressed in §4. An alteration changes an object while preserving its essential nature. Thus a suit of clothes remains a suit of clothes despite being altered.[2] Disruption, on the other hand, denotes a break in continuity that transforms an object’s essential nature. Renting a suit of clothes in half transforms it into rags, which is not to say that the two halves cannot be stitched back together into a whole suit, but it is a more drastic change than a mere alteration. Similarly, in this case, an alteration to the salamanders’ habitat means that a currently viable habitat in which the salamander can nest, breed, feed and migrate changes into another habitat in which, despite some difficulty, it can continue to do all those things. This alteration can become a disruption, triggering a take if WRT’s planned development breaks the continuity of the habitat to the extent that, for some period of time, the salamander cannot carry on its protected activities.
Thus, reading the provisions of G.L.c. 131A in keeping with the usual and ordinary meanings of the statute’s language resolves the language of the statute into a harmonious piece of legislation without superfluity or internal contradiction. Certainly, the Legislature's intent in passing the Endangered Species Act was to limit the extent to which human activity threatens the survival of other species. In seeking to implement this goal, the Legislature recognized that certain types of threats were more harmful than others, and authorized different administrative procedures to handle various threats.
The Division bases its requirement that WRT obtain a conservation and management permit on its assertion that the site development may kill protected salamanders because, deprived of their upland areas, they will no longer be able to nest, breed, feed or migrate. Since the Division’s position is that the development of a golf course will transform the habitat into one in which the salamanders can no longer engage in their protected activities, it may conclude that this is a disruption as opposed to a mere alteration. Therefore, the Division did not exceed its statutory authority in choosing the permitting process as a means of regulating the proposed development at the site. Nor has the Division’s choice to subject WRT to the permitting process deprived WRT of its due process protections. WRT may seek judicial review pursuant to G.L.c. 30A if it believes it was aggrieved by any of the Division’s decisions.
III. The Issue of the Vernal Pools
A vernal pool is a body of water generated by spring rains and/or snow melt. Despite drying up completely at some point, vernal pools provide important habitat because they contain water without predatory fish. Therefore, despite their transitoiy nature, some species such as Marbled and Four-toed Salamanders depend on vernal pools for their existence.
Neither WRT nor the Division deny that vernal pools are subject to environmental regulation. The parties differ only on whether the Division has the authority to regulate them. WRT contends that only the Massachusetts Department of Environmental Protection (“MDEP”), pursuantto G.L.c. 131, §40, The Massachusetts Wetlands Protection Act (“Act”), has authority to regulate vernal pools. The Division counters that certifying vernal pools is not the same as regulating them, and that its power to certify them is implied in the Legislature’s broad statutory grant of authority to support wildlife.
WRT fails to distinguish between certification and regulation in this matter. The literature promulgated by the National Heritage and Endangered Species Program states that regulatory authority over both certified and uncertified vernal pools rests with the Department of Environmental Protection. Thus, the certification process merely acts as a non-exclusive gateway which opens the possibility that specific pools are appropriate for regulation under the Act. Certification of a vernal pool only raises a presumption that regulation is appropriate. This presumption can be rebutted with credible scientific evidence. Therefore, plaintiffs contention that the Department of Environmental Protection delegated its regulatory power over vernal pools has no merit. That department merely sought to take advantage of the Division’s expertise in wildlife habitats to properly identify vernal pools for possible regulation by the Department.
*612 Furthermore, WRT’s assertion that the Division exceeds its statutory grant of authority by merely certifying a vernal pool is similarly misplaced. While WRT may be correct in stating that no statute explicitly grants the Division the power to certify these pools, the inquiry does not stop there. “Powers granted to an agency include those necessarily or reasonably implied.” Mass. Hospital Ass’n, Inc. v. Department of Medical Security, 412 Mass. 340, 342 (1992). The Division’s power to certify vernal pools can be implied from G.L.c. 131, §4(3) which empowers the Division’s director to:
[investigate questions relating to reptiles, amphibians, fish, birds or mammals and, personally or by agents, institute and conduct inquiries pertaining to such questions and- conduct such biological research as will, in his opinion, tend to conserve, improve, and increase the supply of reptiles, amphibians, fish, birds and mammals.
G.L.c. 131, §4(3).
Granting the deference due to the Division’s interpretation of this statute, the Court concludes that a program designed to investigate and certify vernal pools is a reasonable method of accomplishing the Division’s statutory obligations to investigate questions relating to reptiles and amphibians. Therefore, the Division’s ability to certify such pools is a power reasonably implied from the enabling legislation. Finally, since the Division has authority to certify vernal pools, and because such certification is only a preliminary step in the regulatory process, the Court cannot conclude that WRT has been deprived of its due process rights at this stage of the proceedings.
ORDER
For the forgoing reasons, this Court ORDERS that the defendant, Commonwealth of Massachusetts Division of Fisheries and Wildlife’s motion for summary judgment is ALLOWED and the plaintiff, WRT Management Corporation’s motion for summary judgment is DENIED.

 Two more vernal pools were certified within the next several days.

 The fact that G.L.c. 131A, §1, defines alterations only in their detrimental sense does not change the analysis. The statutory presumption that all alterations must be for the worse simply reflects the reality that the Legislature was not concerned with regulating beneficial alterations that promote a species’ continued existence. In any case, the statutory definition does not negate the point that objects retain their integral identity despite alterations.